UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTINA ALFREY and JEFFREY FAY, Individually and as Administrator of the Estate of L.A.F., deceased,<br><br>Plaintiffs,<br><br>v.<br><br>KARI A. WHITLEY, M.D., et al.,<br><br>Defendants. | CIVIL ACTION NO. 3:21-cv-01629<br><br>(SAPORITO, M.J.) |

## MEMORANDUM

Before the court are motions for partial dismissal pursuant to Fed. R. Civ. P. 12(b)(6) filed by the defendant Wayne Memorial Hospital (Doc. 4) and the defendants Kari A. Whitley, M.D., Lehigh Valley Physicians Groups Affiliated with the Lehigh Valley Health Network t/a LVPG Fetal Medicine-Montage ("LVPG") and Lehigh Valley Health Network, Inc. (Doc. 6). Both motions seek the dismissal of Count VII (Negligent Infliction of Emotional Distress) regarding plaintiff Christina Alfrey and Count VIII (Negligent Infliction of Emotional Distress) regarding plaintiff Jeffrey Fay.

For the reasons set forth herein, the motions will be granted in part and denied in part.

## I. Statement of Facts

In their complaint, the plaintiffs have alleged that Christina Alfrey was a thirty-seven-year-old Gravida 4 Para 1 obstetric patient of Eric Rittenhouse, M.D., a physician employed by defendant Wayne Memorial Community Health Centers, which is located at Wayne Memorial Hospital and funded by the United States.

According to the complaint, Ms. Alfrey presented to Wayne Memorial Hospital emergency room on October 31, 2019, complaining of bleeding. She was eventually referred to LVPG for co-management of her pregnancy. Ms. Alfrey was under the prenatal care at LVPG commencing on November 7, 2019. She met with a non-party physician, William E. Scorza, M.D., at LVPG. At the time of her care, Ms. Alfrey was diagnosed with a symptomatic large subchorionic hematoma. Her estimated date of delivery was March 29, 2020. At that time, Ms. Alfrey expressed her preference that she wanted to continue the pregnancy to a live birth. Dr. Scorza noted that if the pregnancy continued, Ms. Alfrey should be admitted to a tertiary care obstetric facility with a NICU at

twenty-four weeks. He also suggested that hospital admission could also be considered at twenty-three weeks. Steroids could be administered at twenty-three weeks or between twenty-three and twenty-four weeks.

On December 5, 2019, at twenty-three weeks, four days into her pregnancy, Ms. Alfrey returned to the Lehigh Valley defendants and she was seen and examined by the defendant, Kari A. Whitley, M.D., an LVPG physician. An ultrasound was performed, and it was noted that Ms. Alfrey's condition was stable with normal growth; vaginal bleeding was daily, but reduced. Because Ms. Alfrey's vaginal bleeding had improved and fetal growth continued with normal fluid, Dr. Whitley decided not to hospitalize Ms. Alfrey as previously contemplated by Dr. Scorza. Later that evening, on December 5, 2019, Ms. Alfrey presented to Wayne Memorial Hospital emergency room complaining of lower abdominal and back pain with vaginal bleeding. Her evaluation occurred shortly after midnight and a nurse noted a small amount of bleeding, no clotting or leaking, and a fetal heart rate tracing was described as 152 and "strong" without decelerations. However, at 1:05 a.m. on December 6, 2019, a speculum examination revealed "blood pooled in vaginal canal" and the cervix was described as 2 cm dilated with 70% effacement and

fetal presentation at -2 station. The complaint alleges that Ms. Alfrey was described as "crying out with c/o lower back and abdominal pain." At 1:30 a.m. blood was drawn and sent to the lab. Ms. Alfrey was contracting every 3 to 5 minutes, and she was cephalic.

At 1:45 a.m., Dr. Rittenhouse spoke to Ms. Alfrey regarding the plan to transfer her care to LVPG. Thereafter, Dr. Rittenhouse signed a transfer order attesting to the medical benefits expected from the transfer to another facility which outweighed the benefits of continued care at Wayne Memorial Hospital. The transfer diagnosis was listed as pre-term labor and bleeding and the reason for transfer was listed as "NICU availability." Despite these circumstances, the request for ambulance transfer to the Lehigh Valley Hospital Cedar Crest—a two-hour ride—was made for a "non-emergent" transfer without lights or sirens. Helicopter transfer, emergent ground transfer, and specialized ambulance crew for transfer were not requested. At 2:58 a.m., the ambulance departed the Wayne Memorial Hospital. Ms. Alfrey was transported by the ambulance driver and one EMT.

While in route to the Lehigh Valley Hospital, Ms. Alfrey reported that she felt the baby "was coming." Upon vaginal examination, it was

noted that the baby was crowning. Shortly thereafter, L.A.F. was delivered in the back of the moving ambulance by the EMT at 4:09 a.m.—an hour and ten minutes after departure from the Wayne Memorial Hospital and approximately one hour from arrival at Lehigh Valley Hospital Cedar Crest.

Upon delivery of L.A.F., the EMT noted the initial APGAR score was 7. The mouth and nose were suctioned and Ms. Alfrey held L.A.F. in wrapped foil for heat. L.A.F. was oxygenated through a blow-by oxygen mask that did not fit his face. Ms. Alfrey delivered the placenta at 4:30 a.m.

Despite upgrading the transport to emergent at approximately 4:30 a.m., the ambulance was unable to divert to St. Luke's Lehighton, a closer facility, as admission there was refused. The ambulance arrived at Lehigh Valley Cedar Crest at 4:46 a.m. The attending physician in the NICU assessed L.A.F. after he was placed on a radiant warmer. She determined that L.A.F. died prior to arrival as there was no spontaneous movement, no tone, and no heart rate. Her examination also noted that L.A.F. was an extremely preterm male who weighed 534 grams.

Ms. Alfrey was upset upon learning of the loss of L.A.F. The plaintiff, Jeffrey Fay, L.A.F.'s father, was at her bedside and provided emotional support. The complaint alleges that Ms. Alfrey sustained severe emotional distress because of her observations during and after L.A.F.'s birth. The complaint alleges that Mr. Fay sustained severe emotional distress because of his observations after L.A.F.'s birth when he was present at the time L.A.F was pronounced dead.

It is this factual backdrop upon which the plaintiffs seek recovery for negligent infliction of emotional distress in Counts VII and VIII in the complaint. The parties have briefed the motions and they are ripe for disposition. (Doc. 5; Doc. 10; Doc. 11; Doc. 13).

## II.  *Legal Standards*

Rule 12 (b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief is granted." Fed. R. Civ. P. 12(b)(6). "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen, Inc.,* 643 F.3d 77, 84 (3d Cir. 2011) (citing

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).  In deciding the motion, the court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellab, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007).  Although the Court must accept the fact allegations in the complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)).  Nor is it required to credit factual allegations contradicted by indisputably authentic documents on which the complaint relies or matters of public record of which we may take judicial notice.  *In re Washington Mut. Ins.*, 741 Fed. App'x 88, 91 n.3 (3d Cir. 2018); *Sourovelis v. City of Philadelphia*, 246 F. Supp. 3d 1058, 1075 (E.D. Pa. 2017); *Banks v. Cty. of Alleghany*, 568 F. Supp 2d 579, 588-89 (W.D. Pa. 2008).

### III.  Discussion

The defendants argue that Counts VII and VIII of the complaint, the plaintiffs' respective claims for NIED, are insufficient as a matter of

law. Over several years, Pennsylvania jurisprudence regarding the tort of NIED has evolved, and the cause of action for negligent infliction of emotional distress is restricted to four factual scenarios:

> (1) situations where the defendant has a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative.

*Toney v. Chester Cty. Hosp.*, 961 A.2d 192, 197-98 (Pa. Super. Ct. 2008), *aff'd by an equally divided court*, 36 A.3d 83 (Pa. 2011). Here, the plaintiffs have explicitly based their NIED claims on the contractual or fiduciary duty scenario. (Doc. 10, at 7, Doc. 13, at 10).

In *Toney,* the Pennsylvania Supreme Court considered cases from other state courts as justification to extend NIED liability to a subset of cases involving preexisting relationships. *Toney,* 36 A.3d at 91-95; *see also Freeman v. Harris Cty.*, 183 S.W. 3d 885 (Tex. Ct. App. 2006); *Oswald v. LeGrand*, 453 N.W. 2d 634 (Iowa 1990); *Larsen v. Banner Health Sys.*, 81 P.3d 196 (Wyo. 2003). *Toney* limited the reach of this extension to "preexisting relationships involving duties that obviously and objectively hold the potential of deep emotional harm in the event of

breach." *Toney,* 36 A. 3d at 95. In so doing, it did not provide an exhaustive list of qualifying relationships, observing that it would be "impossible, and indeed irresponsible on our part." *Id.* Rather, the Court left the legal question of whether a sufficient duty exists to the trial courts to decide "on a case-by-case basis, at some point prior to trial." *Id.*

The defendants contend that the plaintiffs have failed to plead cognizable claims of NIED under this contractual/fiduciary duty scenario.

### A.   *Claim for NIED by plaintiff Alfrey*

In her claim for NIED set forth in Count VII of the complaint, Ms. Alfrey alleged that she was a patient of Dr. Rittenhouse, an agent of defendant Wayne Memorial Hospital, for prenatal care during her pregnancy. (Doc. 1 ¶¶ 12-18, 23). She was referred to LVPG where she presented for her first visit with a non-party, Dr. Scorza, on November 7, 2019. (*Id.* at ¶ 25). She returned to LVPG on December 5, 2019, where she was seen and examined by defendant Dr. Whitley, and an ultrasound was performed at Dr. Whitley's direction. (*Id.* ¶ 26). Dr. Whitley decided not to admit her as an inpatient as earlier recommended by Dr. Scorza, and she released her to home. Later that evening, Ms. Alfrey presented to the Wayne Memorial Hospital emergency room complaining of back

pain and vaginal bleeding. (*Id*. ¶¶ 27-28). During this visit, Dr. Rittenhouse was involved in Ms. Alfrey's care, and he eventually ordered the transfer to Lehigh Valley Hospital Cedar Crest. (*Id*. ¶¶ 29-32). In the complaint, the plaintiffs alleged a variety of breaches of duty by the defendants. (*Id*. ¶¶ 42(a)-(f); 57(a)-(n); 76(a)-(g)). All of these allegations were incorporated by reference in Counts VII and VIII. (*Id*. ¶¶ 87, 96).

The Lehigh Valley defendants argue that the plaintiffs are asserting their NIED claims based upon the "bystander theory." (Doc. 11, at 9). As we noted above, the plaintiffs' NIED claims are explicitly based solely on the contractual/fiduciary duty theory. (*Id*. ¶ 89, n1;¶ 98). Under this theory, the Pennsylvania Supreme Court has expressly recognized an implied duty to care for the plaintiff's emotional well-being in cases "involving the very sensitive and emotionally charged field of obstetrics." *Toney,* 36 A.3d at 95. Here, it is alleged that Ms. Alfrey was a patient of Dr. Rittenhouse, an agent of defendant Wayne Memorial Hospital, and defendant Dr. Whitely, a physician with LVPG. *See Nicholson-Upsey ex rel. Nicholson v. Toney,* November Term, 2009 No. 4525, 2013 WL 8596353, at *12 (Philadelphia Cty. (Pa.) C.C.P. May 7, 2013) ("Both the mother and child are the physicians' and hospitals'

patients."); *see also MDB v. Punxsutawney Christian Sch.,* 386 F. Supp. 3d 565, 594 (W.D. Pa. 2019) ("In *The Law of Torts*, Professor Dobbs explained that caring for the emotional well-being of the plaintiff is a 'duty to take care for the feelings of,' e.g. the mother of a stillborn child.") (citing Dan B. Dobbs, *The Law of Torts* § 29.15 (2000), and noting *Toney's* reliance on and citation of this same treatise). Ms. Alfrey has alleged sufficient facts to survive the defendants' motions to dismiss. Therefore, we will deny the defendants' motion as to Count VII.

### B. *Claim for NIED by plaintiff Fay*

In his claim for NIED, plaintiff Fay has alleged that he was the natural father of L.A.F., that he and Ms. Alfrey, were together appointed administrators of L.A.F.'s estate, and that they reside at the same address. (Doc. 1 ¶¶ 1-3, 83). The complaint alleged that Mr. Fay was at the bedside of Ms. Alfrey when she learned of the loss of L.A.F., providing emotional support to her. (*Id.* ¶ 39). In Count VIII, Mr. Fay alleged that he was present when L.A.F. was pronounced dead, causing him to suffer severe emotional distress. (*Id.* ¶ 97). His emotional distress was allegedly caused by the enumerated acts of the defendants' negligence. (*Id.* ¶ 98).

Like Ms. Alfrey, Mr. Fay is asserting his NIED claim under the contractual/fiduciary duty theory of liability. (*Id.*) But *Toney* limited such a claim to "preexisting relationships involving duties that obviously hold the potential of deep emotional harm in the event of breach," recognizing that such "special relationships must encompass an implied duty to care for the plaintiff's emotional well-being." *Toney,* 36 A.3d at 95. Here, it is undisputed that Mr. Fay was not a patient of the defendants. Nonetheless, Mr. Fay urges us to not remove him from the "special relationship" analysis merely because he was not the obstetric patient.

At this stage of the proceedings—the pleadings stage—we must accept as true the factual allegations in the complaint and view them in the light most favorable to the plaintiff and determine whether the claim lacks facial plausibility. *Warren Gen. Hosp.*, 643 F.3d at 84. In doing so, we may consider *Toney* as persuasive authority given that it was issued by an evenly split plurality decision affirming the Pennsylvania Superior Court's finding that a plaintiff can state an NIED claim under a "special relationship" theory. *Rideout v. Wells Fargo Bank, N.A.*, Civil Action No.

12

21-3326, 2021 WL 4902344 at *11 (E.D. Pa. Oct. 21, 2021); *Herschman v. Muhlenberg Coll.*, 17 F. Supp. 3d 454, 459 (E.D. Pa. 2014).

As noted above, the complaint alleged that Mr. Fay was the father of L.A.F., he is a co-administrator of L.A.F.'s estate, he lives at the same residence as Ms. Alfrey, he was at Ms. Alfrey's bedside to provide her with emotional support, and he was present at the time L.A.F. was pronounced dead. The plaintiff characterizes these allegations as demonstrating Mr. Fay's "full engagement in the care and commitment and the suffering he endured as a result of Defendants' negligence." (Doc. 13, at 14).

Courts that have undertaken the analysis of NIED claims following *Toney* have rejected similar claims of a "special relationship" in a variety of contexts. *Black v. Cmty. Educ. Ctrs., Inc.*, 13-CV-6102, 2014 WL 859313 (E.D. Pa. Mar. 4, 2014) (employer/employee); *Hawkins v. Fed. Nat'l. Mortg. Ass'n*, No. 13-cv-6068, 2014 WL 272082 (E.D. Pa. Jan. 23, 2014 (lender/borrower); *Yarnall v. Philadelphia Sch. Dist.*, No. 11-CV-3130, 2013 WL 552297 (E.D. Pa. Oct. 7, 2013) (union and its members); *Grimaldi v. Bank of Am.*, No. 12-CV-2345, 2013 WL 1050549 (M.D. Pa. Mar. 14, 2013) (lender/borrower); *Okane v. Tropicana Entm't Inc.*, No. 12-

CV-6707, 2013 WL 56088 (E.D. Pa. Jan. 3, 2013) (casino/patron); *Emekekwue v. Offor*, No. 1:11-CV-01747, 2012 WL 1715066 (M.D. Pa. May 15, 2012) (organization and one of its members); *Shulick v. United Airlines*, No. 11-CV-1350, 2012 WL 315483 (E.D. Pa. Feb. 2, 2012) (airline and its passengers); *Weiley v. Albert Einstein Hosp.*, 51 A.3d 202, 218 (Pa. Super. Ct. 2012) (decedent's son and hospital where father died); *Trotta v. Luckinbill*, 12-cv-3062, 2014 WL 353817 (Lycoming Cty. (Pa.) C.C.P. Jan. 13, 2014) (contractor/building owner); *Healey v. Fargo*, No. 11-CV-3340, 2012 WL 994564, at *18 n.13 (Lackawanna Cty. (Pa.) C.C.P. Mar. 20, 2012)(lender/borrower).

The plaintiffs cite a decision by this court, *Humphries v. Pennsylvania State University*, No. 4:20-CV-00064, 2021 WL 4355352 (M.D. Pa. Sept. 24, 2021), in support of their argument that a special relationship existed between Mr. Fay and the defendant doctors and hospital. But we find no support for their position in the *Humphries* decision. Although this court recognized that a special relationship existed in " botched burial cases" between the loved ones of the deceased and those responsible for caring for the corpse, and that a special relationship existed between an obstetrician and expectant mother who

was his or her patient, *Humphries* said nothing whatsoever to support an extension of the latter special relationship to include the non-patient unmarried partner of the expectant mother as well. *See id.* at *22. The *Humphries* court only touched on these scenarios in reaching the conclusion that no special relationship existed between a university and its student-athletes. *See id.*

We find a different case, *Weiley v. Albert Einstein Hospital*, 51 A.3d 202 (Pa. Super. Ct. 2012), to be apposite and more persuasive in the context of this case. In *Weiley*, without the consent of the plaintiff son, the defendant hospital allegedly sent the deceased body of the plaintiff's father, via a funeral home, to a medical school for holding. After several days of contacting the medical school to locate his father's body, the son became distraught. He brought several claims against the defendants, including a claim of NIED. The Superior Court of Pennsylvania affirmed a trial court decision that sustained preliminary objections to the NIED claim, finding it legally insufficient because the son failed to establish that the defendant hospital owed him a fiduciary duty of care. *Id.* at 217. The court's analysis included whether the allegations of the complaint sufficiently pled a confidential relationship based upon the facts and

15

circumstances of that case. In concluding that the plaintiff son's complaint was legally insufficient to establish that the hospital owed him any fiduciary duty of care sufficient for the duty element of an NIED claim, the court made the following observations: (1) the plaintiff made no attempt to assert or explain how the defendant hospital failed to deal with him on equal terms; (2) the plaintiff failed to allege what advice or counsel from the hospital he relied upon to his detriment; (3) how the hospital used its position to the plaintiff's detriment; and (4) the plaintiff did not allege how he had anything akin to the patient-doctor relationship presented in *Toney*. *Id*. at 218-19.

    Here, Mr. Fay has alleged that he is the natural father of L.A.F. He has not alleged any facts to establish that the defendants had a fiduciary relationship with him. We have thoroughly examined the complaint and we find that it is devoid of facts which would establish any special relationship between Mr. Fay and the defendants. Without a factual recitation as to his relationship and interactions with the defendants, his status of natural father of L.A.F., standing alone, does not place him in the special relationship with the defendants necessary to overcome the limitations of NIED claims to preexisting relationships. He does not

allege the extent of his interaction with the defendants and whether they knew that he was involved in the care and support of Ms. Alfrey. Nor does he allege the nature of the defendants' conduct that puts him in a special relationship with the defendants. Thus, despite the indisputable grief he experienced at the loss of L.A.F., we are constrained to grant the motions as to his NIED claim.[1] Nonetheless, we will afford Mr. Fay the opportunity to file an amended complaint to flesh out his interactions with the defendants.

An appropriate order follows.

<u>*s/Joseph F. Saporito, Jr.*</u><br>
JOSEPH F. SAPORITO, JR.<br>
U.S. Magistrate Judge

Dated: May 31, 2022

---

[1] Our decision is not intended to diminish the role of a natural father in the care and nurturing of his child from conception to birth and the development of the child after birth. Nor does it ignore the comfort and care he may provide to the child's mother—especially during her pregnancy. Our decision is limited only to the facts alleged in the complaint. It is not to be construed as disqualifying a natural father's pursuit of an NIED claim upon legally sufficient allegations. We are bound by the current state of the law and its limitations on NIED claims of this nature regarding special relationships.